**The relief described hereinbelow is SO ORDERED.**

**Signed March 12, 2019.**

_____
Ronald B. King
**Chief United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | BANKRUPTCY NO.   18-51837-RBK |
| | § | |
| COWBOYS FAR WEST, LTD., | § | |
| | § | |
| DEBTOR | § | CHAPTER 11 PROCEEDING |

## ORDER GRANTING EMERGENCY APPLICATION TO SELL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES

On March 7, 2019 came on for consideration Cowboys Far West, Ltd.'s Motion for Authorization to Sell Real Property Free and Clear of All Liens, Claims and Encumbrances ("Motion"). [Doc. 95].   At the hearing, Mr. Brian S. Engel was present and representing Crossroads 2004, LLC.    Mr. Thomas Rice, counsel for PSB Credit Services, Inc. was present. Mr. Don Stecker was present for the taxing authorities. Mr. Dean W. Greer was present for the purchaser, Heiser Development Corporation, and Mr. James S. Wilkins and Mr. Robert W. Wilson were present and were counsel for the Debtor. The Court, having reviewed the Motion considered the pleadings of record and heard the evidence and arguments of counsel and having determined that all parties entitled to notice of said Motion were properly notified and no opposition to said Motion, to the extent it seeks authority to sell

1

certain real and personal property and improvements identified in the Purchase and Sale Agreement [Version: 3-5-19] (Attached as Exhibit "B")free and clear of liens, has been filed by any party, it is of the opinion and finds that the sale of the property described in the Purchase and Sale Agreement [Version: 3-5-19] (Attached as Exhibit "B")   is in the best interest of the creditors and the Estate.

It is therefore ORDERED that Debtor, subject to the terms and conditions of that **Purchase and Sale Agreement [Version: 3-5-19]** (Attached as Exhibit "B") and this order, is authorized to sell the following property:

<u>a)</u>     <u>Real Property</u>

Lot 4, New City Block 12188, Interchange Park Unit 2-D, an addition to the City of San Antonio, Bexar County, Texas according to the Map or Plat thereof, recorded in, Volume 9537, Page 22, Deed and Plat Records of Bexar County, Texas, which includes, but is not limited to the contiguous lot on Fratt Road, San Antonio, Texas 78218 (Tax Accounts 12179-000-0148)and (Tax Account No. 12188-000-0042 and Personal Property Tax Account No. 90308-502-0425, all as more fully described on Exhibit "A" of the Purchase and Sale Agreement [Version: 3-5-19] (Attached as Exhibit "B")

<u>b)</u>     <u>Personal Property</u>

(1)     Upon closing, Seller shall assign to Buyer all Seller's interest in and to any condemnation awards or insurance proceeds which may be payable to Seller because of such occurrence; provided that, if any such awards or proceeds are paid prior to the Closing, Seller shall pay Buyer an amount equal to such awards or proceeds at Closing. At Closing Buyer shall take charge of the Condemnation Litigation and shall be the beneficiary of one hundred percent (100%) of the award or other proceeds arising from any condemnation of the Property pertaining thereto.

(2)     All other tangible and intangible personal property of every kind or character now owned or hereafter acquired by Seller and affixed or attached to, or used or useful in connection with, the Land and   improvements, including without limitation, trademarks, telephone numbers, intellectual property, and any fixtures, attachments; any

2

and all civil, engineering, mechanical, building, and architectural plans and drawings, and all contracts, certificates, licenses, permits, applications, authorizations, approvals, no action letters and similar assurances (including, without limitation, all environmental permits, zoning variances, plats approvals, sit plan approvals, development permits and/or building permits) granted or issued by a private person or by any governmental or quasi-governmental authority, and which related to the Land and/or such Improvements. Notwithstanding the foregoing to the contrary, the Personal Property shall not include, and Seller hereby reserves and excludes therefrom, all of Seller's rights, title, and interest in and to cash, accounts receivables and office furniture. Hereafter the real property and the equipment/fixtures will be referred to as the "Property".

Specifically, it is ORDERED that Cowboys Far West, Ltd (hereinafter "Debtor") is authorized to sell the Property to Heiser Development Corporation or its assigns (hereinafter "Heiser" or "Buyer").

It is ORDERED that Debtor shall sell the Property for the cash sum not to exceed, nor be less than $7,600,000.00.   The Estate shall be responsible for paying any U.S. Trustee fees that may result from the sale of the Property.

It is further ORDERED, ADJUDGED and DECREED that this sale shall vest title in the Buyer free and clear of all liens, preferential rights, causes of actions, claims, encumbrances, interests (except as expressly excepted to in the deed of conveyance) whatsoever, including but not limited to:

1)        A Deed of Trust dated December 21, 2007 and recorded on December 31, 2007, as Document No. 20070298272, Volume 13285, Page 2020 of the Official Public Records, Bexar County, Texas to secure a debt in the original amount of $5,000,000 by the Debtor in favor of General Electric Capital Corporation, which said Note was additionally secured by Assignment of Leases and Rents, dated December 21, 2007 and recorded on December 31, 2007 in Volume 13285, Page 2036, of the Official Public records Bexar County, Texas. The said Note, and security interests were assigned to Business Property Lending, Inc., a Delaware Corporation by Assignment of Rents, dated October 24, 2012 and recorded on November 08, 2012 in Volume 15787, Page 499, of the Official Public records, of Bexar

3

County, Texas. Subsequently said Assignment of Rents was assigned to Crossroads 2004, LLC, an Oklahoma limited liability company by Assignment of Assignment of Rents dated March 21, 2018 and recorded October 10, 2018 in County Clerk's File No. 20180200578, in the Official Public records, of Bexar County, Texas. Said liens were assigned to Crossroads 2004, LLC an Oklahoma Limited Liability Company by Memorandum of Assignment of Note and Deed of Trust dated February 17, 2017 and recorded on March 14, 2017 as Document No. 20170047766, Volume 18403, Page 33, and Memorandum of Assignment of Note and Deed of Trust (Corrective), dated February 17, 2017 and recorded on October 10, 2018 as Document No. 20180200577, in the Official Public records, of Bexar County, Texas. A Collateral Assignment of Assignment of Leases and Rents was assigned by Crossroads 2004, LLC, an Oklahoma limited liability company to Assignee: Interbank, an Oklahoma banking corporation, dated: October 01, 2018 and recorded on October 15, 2018 in Document No. 20180202932, in the Official Public records, of Bexar County, Texas.

2) A Deed of Trust dated December 21, 2007, recorded on May 15, 2008, in Volume 13496, Page 422 of the Official Public Records, Bexar County, Texas to secure a debt in the amount of $2,500,000. owed by the Debtor in favor of Community Certified Development Corporation (As to Both Tracts). Said Note being additionally secured by Assignment of Leases and Rents dated May 12, 2008 and recorded on May 15, 2008 in Volume 13496, Page 433, of the Official Public records Bexar County, Texas. Said lien being assigned to Business Loan Conduit No. 2, LLC by Assignment of Assignment of Rents dated: May 12, 2008 and recorded May 15, 2008 in Volume 13496, Page 450, of the Official Public records, of Bexar County, Texas. Said lien being assigned to Prinsbank by Assignment of Assignment of Rent dated: November 25, 2015 and recorded on December 02, 2015 in Volume 17584, Page 1266, of the Official Public records, of Bexar County, Texas. Said lien being assigned to PSB Credit Services, Inc. by Assignment dated January 31, 2019 and recorded January 31, 2019 at Doc# 20190017584 of the Official Public records, of Bexar County, Texas.

3) The Lis Pendens arising out of a lawsuit in Cause No.: 2018ED0011, wherein The State of Texas is the Plaintiff and the Defendants are Cowboys Far West, Ltd., a Texas

4

Limited Partnership; Cowboys Concert Hall - Arlington, Inc., a Texas Corporation; Amie Haynes; Crossroads 2004, LLC, an Oklahoma Limited Liability Company; and PrinsBank, recorded: June 13, 2018, in County Clerk's File No. 20180113182, of the Official Public Records, Bexar County, Texas. (As to Tract II)

    4)    The Abstract of Judgment recorded on January 27, 2016 in Volume 17666, Page 2492, of the Official Public records, of Bexar County, Texas arising out of a lawsuit in Cause No. 2012-CI-16520, wherein Amie Haynes is the Plaintiff and Cowboys Far West Ltd, individually and d/b/a Cowboys Dance Hall is the Defendant. The amount of the judgment is $956,970.00

    5)    The Abstract of Judgment recorded on January 31, 2013 in Volume 15922, Page 1968 of the Official Public records, of Bexar County, Texas arising out of a lawsuit in Cause No. 017-244640-10, wherein Bruce Jones is the Plaintiff and Cowboys Concert Hall-Arlington is the Defendant. The amount of the judgment is $125,000.

    6)    The Abstract of Judgment recorded on May 13, 2013 in Volume 16103, Page 1583 of the Official Public records, of Bexar County, Texas arising out of a lawsuit in Cause No. 017-244640-10, wherein Bruce Jones is the Plaintiff and Cowboys Concert Hall-Arlington is the Defendant. The amount of the judgment is $125,000.

    7)    Outstanding interest, title defects, unrecorded leases, unauthorized or *ultravires* conveyances by previous owners.    It is further

ORDERED, ADJUDGED and DECREED that all the above enumerated items and all other interests, liens, encumbrances and causes of actions shall, upon closing *and* funding of the $7,600,000.00, be paid, cured, released and extinguished as against the Property but shall attach to the proceeds unless otherwise expressly stated herein.

It is further ORDERED, ADJUDGED and DECREED that this sale does not and will not subject or expose the Buyer, its successors or assigns, to any liability, claim, cause of action or remedy by reason of such sale and transfer, including, without limitation, any claim, cause of action or remedy based **on** any theory of successor or transferee liability and that Heiser shall not assume any liability or obligation of the Debtor, fixed or contingent, disclosed or undisclosed, or any liability for such claims, debts, defaults, duties,

defect of title, obligations or liabilities of the Debtor of any kind or nature, whether known or unknown, contingent or fixed, all of which, to the extent that they existed prior to the Closing Date, are retained by the Debtor and to the extent of their validity and priority shall attach to and be satisfied only from the proceeds deposited in escrow as hereinafter provided unless otherwise expressly stated herein.

It is further ORDERED, ADJUDGED and DECREED that the sale shall be closed by and at, and the sale proceeds shall be distributed as hereafter provided, by First American Title Guaranty Company.

It is further ORDERED, ADJUDGED and DECREED and this Court so finds that Heiser is good faith purchaser of the Property

It is further ORDERED, ADJUDGED and DECREED that nothing in either the Motion or this Order shall be construed to affect the tax obligations (positively or negatively) upon all persons or entities affected by this sale, except as otherwise specifically provided herein

It is further ORDERED, ADJUDGED and DECREED that the following debts or liabilities shall be paid at closing from the Seller's proceeds by First American Title Guaranty Company:

a) closing cost (including 2019 real and personal tax prorations and escrow agent attorney fees),

b) owner's title insurance premium,

c) All escrow/closing fees,

d) Buyer's Attorney Fees ($60,000 to the Law Firms of Dean W. Greer and Ari Kuchinsky of Metcalfe Wolff Stuart & Williams, LLP;

e) Survey Costs;

f) Phase One Environmental Study;

g) $5,660,769.31(computed as of March 7, 2019) Additional interest on said sum shall accrue and be payable at the $1,649.69 per day, with the final payoff sum to be computed on and as of the date the closing occurs Payment to Crossroads 2004, LLC of the payoff sum computed as provided herein shall

be deemed to fully pay and satisfy the indebtedness secured by the first lien dated December 21, 2007 on the Property;

h)      The cumulative Bexar County ad valorem taxes for tax years 2018 and prior in the amount of $286,943.89. pertaining to Tax Account No. 12188-000-0042 (3030 NE Loop 410); Tax Account No. 12179-000-0148 (Fratt Road) and Tax Account No. 90308-502-0425 (business personal property located at 3030 NE Loop 410)

i)       United States Trustee's Fees in the amount of $80,000.00.

IT IS FURTHER ORDERED that the ad valorem taxes for year 2019 pertaining to the subject real property shall be prorated in accordance with the Earnest Money Contract and shall become the responsibility of the Purchaser and the 2019 ad valorem tax lien shall be retained against the subject real property until said taxes are paid in full.

IT IS FURTHER ORDERED that except for the sums paid to Bexar County for ad valorem taxes entitled to priority, the payoff sum payable to Crossroads 2004, LLC shall have priority over and be paid before any other amounts out of the sale proceeds.

It is further ORDERED, ADJUDGED and DECREED that notwithstanding anything to the contrary in this order, no liens shall be released unless Heiser has fully funded the sales price as described herein with First American Title Guaranty Company, the closing has occurred, and the funds have been disbursed to the lienholder.

It is further ORDERED, ADJUDGED and DECREED that the Debtor shall pay to PSB Credit Services, Inc. the balance of all monies remaining with the title company after paying the items set forth in (a) through (i) above; however, such amount shall be not less than $1,400,000.00.

It is further ORDERED, ADJUDGED and DECREED that the Debtor on behalf of itself and all of its agents, directors, officers, employees, attorneys, partners, shareholders, servants, heirs, spouses, executors, and those in privity with them, does hereby release and discharge PSB Credit Services, Inc. and all of their agents, directors, officers, employees, attorneys, partners, shareholders, servants, heirs, spouses, executors, and those in privity with them, from any and all liabilities, demands, counterclaims, and causes of action, including but not limited to those causes of action arising under Chapter 5 of the Bankruptcy Code.

7

It is further ORDERED, ADJUDGED AND DECREED that the stay under Bankruptcy Rules 6004(g) and 6006(d) are waived and are not in effect.

It is further ORDERED, ADJUDGED AND DECREED that Michael Murphy, as President of the general partner of the Debtor is authorized to execute all documents on behalf of the Debtor that are contemplated by the Purchase and Sale Agreement [Version: 3-5-19] (Attached as Exhibit "B, including but not limited to a Warranty Deed and a Bill of Sale.

###

**Attorney Responsible for Order***

**Dean W. Greer**
**Law Offices of Dean W. Greer**
**2929 Mossrock, Suite 117**
**San Antonio, Texas 78230**
**Telephone No. 210.342.7100**
**Facsimile No. 210.342.3633**
**Email: dwgreer@sbcglobal.net**
**State Bar No. 08414100**

**\* This order has been submitted only after review and approval by counsels for Crossroads 2004, LLC; PSB; Bexar County taxing authorities; and the Debtor.**

# EXHIBIT A

## Legal Description of the Land

TRACT 1 (5.441 ACRE TRACT):

### FIELD NOTES DESCRIBING A 5.441 ACRE (237,012 SQ.FT.) TRACT

Field notes describing a 5.441 acre (237,012 sq. ft.) tract out of New City Block 12179, and out of the D.J. Davis Survey No. 103, Abstract No. 208, the J.G. Miller Survey No. 103 ½, Abstract No. 532 and the Gertrude Rodriguez Survey No. 132 and being a part of a 51.083 acre tract, a part of a 14.115 acre tract and a part of Fratt Road closed by Quit Claim Deed, Volume 7189, Pages 929-931, Deed Records, Bexar County, Texas. Said 51.083 acre tract and 14.115 acre tract recorded in Volume 5892, Page 1753, Real Property Records, Bexar County, Texas. Said 5.441 acre (237,012 sq. ft.) tract more particularly described as follows:

BEGINNING at a ½" iron pin found in the northwest right-of-way line of Interchange Parkway for the northeast corner of this tract and the southeast corner of Lot 4, N.C.B 12188, Interchange Parkway, Unit 2-D, Volume 9537, Page 22, Deed and Plat Records, Bexar County, Texas.

THENCE with a curve to the right along the northwest right-of-way line of Interchange Parkway having a radius of 453.87 feet and length of 116.88 feet (Chord bears S 42°84'1'11"W, 116.55 feet) to a ½" inch iron pin found at a point of reverse curvature.

THENCE with a curve to the left along the northwest right-of-way Interchange Parkway having a radius of 657.04 feet and length of 379.63 feet (Chord bears S 33°27'29" W, 374.07 feet) to a ½" iron pin set with a yellow plastic cap stamped "Ford Eng., Inc.".

THENCE S 16°58'31"W. 25.97 feet with the northwest right-of-way line of Interchange Parkway to a ½" iron pin found at the beginning of a return curve to the right into the north right-of-way line of Fratt Road for a southeast corner of this tract;

THENCE with said curve to the right having a radius of 25.00 feet and length of 31.01 feet (Chord bears S 52°30'18" W. 29.06 feet) to a ½" inch iron pin found in the north right-of-way line of Fratt Road for a southeast corner of this tract;

THENCE S 88°02'05" W, 485.47 feet with the north right-of-way line of Fratt Road to a ½" iron pin set with a yellow plastic cap stamped "Ford Eng., Inc." for the southwest corner of this tract;

THENCE N 14°03'58" E. 206.32 feet to a ½" iron pin set with a yellow plastic cap stamped Ford Eng., Inc." for a corner of this tract;

THENCE N 25°26'19" E, 259.58 feet to a ½" iron pin set with a yellow plastic cap stamped "Ford Eng., Inc." in the south line of said Lot 4 for the northwest corner of this tract;

THENCE N 87°59'56" E, 640.39 feet with the south line of said Lot 4 to the POINT OF BEGINNING and containing 5.441 acres (237,012 sq. ft.) of land according to a survey made under my supervision.

Reference Bearing is north right-of-way line of Fratt Road.
Corresponding plat prepared.
740300FN.DOC

Doc# 20040120074
Pages 4
05/28/2004  09:55:59 AM
Filed & Recorded in
Official Records of
BEXAR COUNTY
GERRY RICKHOFF
COUNTY CLERK
Fees $20.00

MAY 2 8 2004

COUNTY CLERK BEXAR COUNTY, TEXAS

Book 10768 Page 2163



EXHIBIT A

*Exhibit A*

## TRACT 2 (11.07 ACRES):

### DESCRIPTION OF REAL PROPERTY

Lot 4, New City Block 12188, Interchange Park Unit 2-D, an addition to the City of San Antonio, Bexar County, Texas according to the map or plat thereof, recorded in, Volume 9537, Page 22, Deed and Plat Records of Bexar County, Texas and being more particularly described as follows:

11.07 acres out of that certain 12.15 acre, tract of land, being out of that 51.083 acres and 14.115 acres recorded in Volume 5892, Pages 1753-1760 of the Official Public Records of Real Property of Bexar County, Texas and a portion of the Old Pratt Road quitclaim by City Ordinance No. 60926, dated June 27, 1985, recorded in Volume 3473, Page 1651 of the Official Public Records of Real Property of Bexar County, Texas, being out of New City Block (N.C.B.) 12179 and N.C.B. 12188 of the City of San Antonio, out of the D. J. Davis Survey No. 103, Abstract 208, County Block 5029 of Bexar County, Texas. Said 12.15 acres being further described by metes and bounds as follows:

COMMENCING at a found ½" rod at the north end of the north return from the north right-of-way line of Pratt Road, an 86-foot right-of-way described in the Interchange Park Subdivision Unit 2A, recorded in Volume 9510, Pages 125-126 of the Deed and Plat Records of Bexar County, Texas, on the southeast right-of-way line of Austin Highway, U. S. Highway 81;

THENCE North 34 deg. 14'05" East, along and with the southeast right-of-way line of Austin Highway a distance of 299.74 feet to a found ½" iron rod at the southwesternmost corner of Lot 1-L, recorded in Volume 3700, Page 191, of the Deed and Plat Records of Bexar County, Texas;

THENCE North 39 deg. 13'20" East, along and with the southeast right-of-way line of Austin Highway a distance of 97.42 feet to a set ½" iron rod with yellow cap marked "Pape Dawson" for the southwest corner and POINT OF BEGINNING of this tract;

THENCE along and with the southeast right-of-way of Austin Highway and continuing with the south right-of-way line of Loop 410 the following calls and distances:

North 39 deg. 13'20" East, a distance of 112.45 feet to a found ½" iron rod at the north corner of Lot 2-L recorded in Volume 3700, Page 191, of the Deed and Plat Records of Bexar County, Texas;

North 43 deg. 44'04" East, a distance of 73.23 feet to a found TxDOT monument with brass plate and "+";

North 42 deg. 32'42" East, a distance of 332.12 feet to a found TxDOT monument with brass plate and "+" at the westerly cutback corner of Tract "O" N.C.B. 12179, recorded in Volume 4927, Pages 371-372, of the Deed Records of Bexar County, Texas, at the northwest corner of the aforementioned quitclaimed portion of the Old Pratt Road;

North 44 deg. 22'42" East, across the north end of the said Old Pratt Road a distance of 160.98 feet to a found ½" iron rod at an angle point in the aforementioned 14.115 acre tract;

*Exhibit A – Page 2*

North 46 deg. 14'59" East, continuing with the northwest line of the said 14.115 are tract a distance of 480.46 feet to a set ½" iron rod with a yellow cap marked "Pape Dawson";

North 52 deg. 58'31" East, a distance of 306.46 feet to a set ½" iron rod with yellow cap marked "Pape Dawson" at a point of curvature, the west return from the northwest right-of-way line of Interchange Parkway, an 86-foot right-of-way described in the Interchange Park Subdivision Unit 2A, recorded in Volume 9510, Pages 125-126, of the Deed and Plat Records of Bexar County, Texas;

THENCE Northeasterly, easterly, and southeasterly with a curve to the right, said curve having a radius of 26.66 feet, a central angle of 90 deg. 00"45", a chord bearing and distance of South 82 deg. 01'07" East, 37.71 feet, and an arc length of 41.88 feet to a found ½" iron rod at a point of compound curvature;

THENCE along and with the northwest right-of-way line of the said Interchange Parkway the following calls and distances:

Southeasterly, and southerly with a curve to the right, said curve having a radius of 25.34 feet, a central angle of 17 deg. 15'26", a chord bearing and distance of South 28 deg. 23'00" East, 7.60 feet, and an arc length of a 7.63 feet to a set ½" iron rod with yellow cap marked "Pape Dawson" at a point of compound curvature;

Southerly with a curve to the right, said curve having a radius of 107.91 feet, a central angle of 29 deg. 32'12", a chord bearing and distance of south 04 deg. 59'09" East, 55.01 feet, and an arc length of 55.65 feet to a found 1/2" iron rod at a point of tangency;

South 09 deg. 46'57" West, a distance of 731.31 feet to a found 1/2" iron rod at a point of curvature;

Southerly, and Southwesterly, with a curve to the right, said curve having a radius of 453.87 feet, a central angle of 25 deg. 36'26", a chord bearing and distance of South 22 deg. 35'10" West, 201.17 feet, and an arc length of 202.85 feet to a set ½" iron rod with yellow cap marked "Pape Dawson" at a point of intersection with a non-tangent line, the southeast corner of this tract;

THENCE South 88 deg. 02'05" West, a distance of 906.76 feet to the POINT OF BEGINNING and containing 12.15 acres in the City of San Antonio, Bexar County, Texas, less a 1.08 acre tract of land on the southwest corner of N.E. Loop 410 and Interchange Parkway, for a total of 11.07 acres.

**EXHIBIT "A"**

## PURCHASE AND SALE AGREEMENT [Version: 3-5-19]

THIS **PURCHASE AND SALE AGREEMENT** (the "**Contract**") is dated March 5, 2019, but is effective as of the Effective Date (as hereinafter defined) by and between **COWBOYS FAR WEST, LTD.**, a Texas limited partnership ("**Seller**"), and **HEISER DEVELOPMENT CORPORATION**, a Texas corporation ("**Buyer**"), for the purchase and sale of that certain property described herein on the terms and conditions set forth below.

1.     **Property**.  Seller agrees to convey to Buyer that certain tract of land situated at 3030 NE Loop 410 in San Antonio, Bexar County, Texas, consisting of approximately 16.63 acres (the "**Land**") as more fully described on **Exhibit A** attached hereto, together with all rights and appurtenances relating or pertaining thereto (collectively, the "**Property**"), including, without limitation, the following:

(a)     Any building, structures, fixtures, or other improvements situated on, over and/or under the Land (the "**Improvements**");

(b)     All and singular the rights and appurtenances pertaining to the Land and/or such Improvements, including, without limitation, all right, title and interest of Seller in and to adjacent streets, roads, alleys, easements and rights-of-way, and all awards made or to be made in connection therewith (the "**Appurtenances**");

(c)     As and if applicable, if and to the extent the same would not comprise and be considered a part of the Appurtenances described in subparagraph (b) above, all water rights, wastewater rights, utility rights and allocations, living unit equivalents, utility commitments, and development rights associated with or appurtenant to the Land and/or such Improvements (the "**Development Rights**"); and

(d)     All other tangible and intangible personal property of every kind or character, now owned or hereafter acquired by Seller and affixed or attached to, or used or useful in connection with, the Land or Improvements, including without limitation, trademarks, telephone numbers, intellectual property, any and all civil, engineering, mechanical, building, and architectural plans and drawings, and all contracts, certificates, licenses, permits, applications, authorizations, approvals, no action letters and similar assurances (including, without limitation, all environmental permits, zoning variances, plat approvals, site plan approvals, development permits and/or building permits) granted or issued by a private person or by any governmental or quasi-governmental authority and which relate to the Land and/or such Improvements (collectively, the "**Personal Property**"). Notwithstanding the foregoing to the contrary, the Personal Property shall not include and Seller hereby reserves and excludes therefrom, all of Seller's right, title, and interest in and to cash, accounts receivable and office furniture.

2.     **Consideration**.  The consideration for the conveyance shall be as follows:

(a)     Purchase Price.  The total purchase price for the Property ("**Purchase Price**") shall be an amount equal to SEVEN MILLION SIX HUNDRED THOUSAND AND NO/100 US DOLLARS ($7,600,000.00).



(b)     Earnest Money.  Buyer shall, within ten (10) days after the Effective Date of this Contract, deposit TEN THOUSAND AND 00/100 DOLLARS ($10,000.00) as earnest money ("**Earnest Money**") with First American Title Company, 1221 S. Mopac, Suite 150, Austin, Texas 78746, Attn: Debbie Hernandez, 512-942-6556 ("**Title Company**").  The Earnest Money shall be held in an interest-bearing account and the interest in the account shall become part of the Earnest Money. If the transaction contemplated hereby is consummated and Closing shall occur in accordance with the terms of this Contract, the Earnest Money shall be credited and applied toward the Purchase Price at Closing. In all other events, the Earnest Money shall be disbursed by the Title Company in accordance with this Contract.

3.     **Title Commitment**.  Within ten (10) days after the Effective Date of this Contract, Seller shall, at Seller's sole cost and expense, deliver to Buyer and Buyer's legal counsel a current Commitment for Title Insurance ("**Title Commitment**") issued by the Title Company, showing Seller as the record owner of the Land, showing the terms by which Title Company agrees to issue a title policy at Closing insuring Buyer's fee simple title to the Land to be good and indefeasible, and showing all matters affecting title to the Property, including all exceptions, easements, restrictions, rights of way, covenants, reservations, and other conditions or encumbrances affecting the Property which will appear in the owner's policy of title insurance, together with legible copies of all recorded documents constituting exceptions under the Title Commitment.  Delivery of a title commitment which does not meet the requirements of this paragraph shall not constitute delivery and receipt of the Title Commitment under this paragraph. Upon delivery of the Title Commitment, Seller shall also deliver to Buyer copies of all written leases, tenancies, and rental agreements affecting the Property, if any, and a full written description of any such agreements which are not written.

4.     **Survey**.  Seller will deliver to Buyer copies of any existing surveys of the Property with the Documents (as defined below).  Buyer shall, at its expense, but subject to the reimbursement at Closing as provided below, order a current survey of the Property (the "**Survey**"); provided, however, if and when Closing shall occur, Seller shall, at Closing, reimburse Buyer for the actual cost and expense of the Survey. Buyer will deliver a copy of the Survey to Seller and Title Company upon receipt thereof.

5.     **Title and Survey Objections**.  Buyer shall have twenty (20) days from the date of Buyer's and Buyer's legal counsel's receipt of all of the Title Commitment (including exception documents) and the Survey to object to any title exceptions shown thereby or any provisions thereof by giving written notice to Seller; provided that matters not objected to by Buyer within such 20-day period shall be deemed to be acceptable to Buyer and to be Permitted Exceptions (as hereinafter defined). Seller shall use reasonable efforts to cure any title objections but Seller shall not be obligated to cure any such objections except as provided below. Seller shall have the right to use the Purchase Price at Closing for the purpose of curing any such objections. Notwithstanding the foregoing sentence, Seller shall cure, at Seller's expense, any encumbrances, all liens encumbering the Property, and all items shown on Schedule C (or other similar "Requirements" Schedule) of the Title Commitment.  If Seller fails to cure any such objections, Buyer may, at its sole option at any time prior to Closing, either (i) cancel this Contract by giving Seller written notice thereof, and in such event the Earnest Money shall be immediately returned to Buyer, or (ii) waive the objections and consummate the purchase of the

Property (or a portion thereof, as the case may be) subject to the objections; provided, however, in no event will any requirements or exceptions on Schedule C (or other similar "Requirements" Schedule) of the Title Commitment be waived, and Seller shall be and remain responsible for addressing and/or removing all such requirements and/or exceptions to the satisfaction of Buyer and the Title Company. Any exceptions to title that are either accepted or waived by Buyer hereunder shall be referred to as "**Permitted Exceptions**."

6.    **Due Diligence; Lender Forbearance**.

(a)    Due Diligence Documents. Seller, at its sole cost and expense, shall furnish to Buyer, within three (3) business days after the Effective Date of this Contract, the following items, to the extent within Seller's possession or control (which shall include those in the possession or control of any consultants, advisors, and/or experts retained by Seller) (collectively, the "**Documents**"):

i.    Copies of all certificates, licenses, permits, authorizations, approvals and similar assurances issued by any governmental or quasi-governmental authority relating in any way to the Property;

ii.    Copies of all site plans, surveys, plats, soils and substrata studies, topographical maps, geotechnical studies, flood plain information, water studies, environmental studies or audits, physical inspection reports, architectural renderings, plans and specifications, engineering plans and studies, traffic studies, utility plans and studies (including any information related to water, wastewater, gas and electric utility service), utility extension easements, and any other plans, diagrams or studies of any kind which relate, in whole or in part, to the Property;

iii.    Evidence of the current status of the zoning classification applicable to the Property, subdivision plats covering the Property (including, but not limited to, any preliminary plans and proposed plats for any resubdivision affecting any portion of the Property), availability and location of utilities and availability of current, proposed access from the Property to public streets and roads, and a traffic study including a listing of road construction;

iv.    All information related to the zoning of the Property and all information related to the Development Rights and Personal Property, if any, including without limitation, all civil, engineering, mechanical, building, and architectural plans, permits, applications, certificates, warranties, covenants or restrictions affecting the Property, proposed or existing property owners' association documents;

v.    True and correct copies of all ad valorem tax statements and special assessments for the five (5) year period preceding the Effective Date of this Contract and the current tax appraisal; and

vi.    All other materials or information relating in any way to the Property.

(b)     Environmental Report. Additionally, Seller, at its sole cost and expense, shall furnish to Buyer, within fifteen (15) days after the Effective Date of this Contract, a Phase One Environmental Assessment report for the Property, addressed to Buyer and prepared by an engineering firm satisfactory to Buyer, detailing the existence of any hazardous substances and/or other environmental issues or matters pertaining to the Property.

(c)     Zoning Verification Documents. Seller, at its sole cost and expense, shall furnish to Buyer, within seven (7) days after the Effective Date of this Contract, a letter from (i) the applicable entity identifying the Property's current zoning, and (ii) the applicable utility companies describing the utility services available to the Property.

(d)     UCC, Lien, and Other Searches. Buyer shall, at its expense,  may order UCC, Tax Lien, Litigation, Bankruptcy, and Judgment searches on Seller.

7.     **Investigations**. From the Effective Date of this Contract until its termination or Closing, Buyer and its representatives shall have the right to enter upon the Property to conduct investigations, including without limitation, soil tests, engineering studies, planning feasibility studies, environmental inspections, a study of the availability and status of utilities, drainage, zoning, topography, access, development feasibility, and sewer, and such other investigations as Buyer may desire to determine the suitability of the Property for Buyer's intended use.  Buyer shall have no liability for any disclosure of existing environmental or other conditions pertaining to the Property that result from Buyer's investigations of the Property.

8.     **Feasibility Period**.

(a)     Feasibility Period.  Seller agrees that Buyer shall have through the earlier of (i) **April 1, 2019** or (ii) Closing (such period of time the "**Feasibility Period**"), to determine the suitability of the Property for Buyer's intended use.  If Buyer decides in its sole and absolute discretion not to proceed with the purchase of the Property, for any or no reason, Buyer shall give Seller written notice of termination on or before the last day of the Feasibility Period, in which event this Contract shall terminate and be of no further force and effect, and Buyer shall receive back all of the Earnest Money (and Seller hereby directs the Title Company to release the Earnest Money to Buyer under such circumstances) except $100.00 which shall be paid to Seller as consideration for this option.

9.     **Closing**.     The consummation of the sale of the Property from Seller to Buyer (the "**Closing**") will take place at the office of the Title Company on or before April 1, 2019.

10.     **Closing Documents and Payment of Purchase Price**.

(a)     Seller's Closing Documents. The following documents shall be delivered by Seller at Closing:

i.     Deed.  A duly executed and acknowledged special warranty deed, prepared by Buyer's counsel on the State Bar Form, other form acceptable to Seller and Buyer (the "**Deed**"), conveying to Buyer good and indefeasible title to the Property, free and clear of all restrictions, easements, liens, and other

encumbrances except the Permitted Exceptions.

    ii.    <u>Bill of Sale</u>. A duly executed bill of sale, assignment, and blanket conveyance, prepared by Buyer's counsel on the State Bar form, or other form acceptable to Seller and Buyer (the "**Bill of Sale**"), assigning and conveying to Buyer all of the items comprising the remainder of the Property as described in subparagraphs (b)-(d) of <u>Paragraph 1.</u>

    iii.    <u>Title Policy</u>. Seller shall furnish at Seller's sole costs and expense an owner's policy of title insurance issued by the Title Company in a form prescribed by the Board of Insurance Commissioners of Texas with an underwriter approved by Buyer, which policy shall (1) be in the amount of the Purchase Price, (2) guarantee that Buyer's title to the Property is good and indefeasible subject only to the following exceptions: (A) the Permitted Exceptions, and (B) taxes for the current year and subsequent years, (3) insure any easements, rights-of-way, licenses or other similar rights or interests pertinent to or otherwise benefitting the Property, and (4) subject to <u>Paragraph 11(b)</u> below, contain such other endorsements as may be required by Buyer.

    iv.    <u>Tax Certificates</u>. Seller shall deliver tax certificates showing there are no delinquent taxes levied or assessed against the Property as of Closing.

    v.    <u>Affidavit of Foreign Status</u>.  Seller shall deliver to Buyer an affidavit that Seller is not a "foreign person" pursuant to Section 1445 of the Internal Revenue Code.

    vi.    <u>Authority</u>.  Seller shall deliver evidence of Seller's authority to consummate the contemplated transaction satisfactory to the Title Company and Buyer.

    vii.    <u>Other</u>. Seller shall deliver any other closing documents required by this Contract or reasonably requested by Buyer and/or the Title Company, including without limitation a typical seller's title affidavit.

    (b)    <u>Buyer's Closing Documents and the Purchase Price</u>. The following shall be delivered by Buyer at Closing:

    i.    <u>Purchase Price</u>. The Purchase Price in accordance with <u>Paragraph 2(a)</u> above.

    ii.    <u>Bill of Sale</u>. Buyer's duly executed counterpart to the Bill of Sale.

11.    **Closing Costs**. Closing costs and prorations shall be allocated as follows at Closing:

    (a)    <u>Taxes and Utilities</u>.  The parties hereby acknowledge and agree that taxes and utility costs shall be prorated as of 11:59 p.m. the day immediately preceding the Closing Date (the "**Adjustment Point**"). Seller will be responsible for taxes and utility costs that have accrued

before the Adjustment Point (including any taxes owing for prior years) and Buyer will be responsible for taxes and utility costs that accrue after the Adjustment Point. If the current year's taxes are not known as of the date of Closing, the proration shall be based upon the previous year's taxes with an adjustment made between Seller and Buyer within thirty (30) days after the current year's taxes are known. Taxes for the year of Closing and subsequent years shall be assumed by Buyer.

(b)   Closing Costs. Except as is otherwise provided herein, each party shall pay its own customary closing expenses and its own attorneys' fees. Seller shall pay the following cost and expenses at Closing: (i) the fees for recording the Deed at Closing; (ii) the base premium for the owner's title policy described in Paragraph 10(a)(iii) above; (iii) the Survey reimbursement payable to Buyer pursuant to Paragraph 4 above; (iv) one-half (1/2) of any escrow fees charged by Title Company; (vi) the actual cost of causing the release of all party liens that have attached to the Land on or before the date of Closing; (vii) any bankruptcy trustee fee associated with the Pending Bankruptcy, and (viii) the broker commissions payable to the Brokers (as defined below) pursuant to Paragraph 17 below. Buyer shall pay the following cost and expenses at Closing: (i) any endorsements, modifications, or deletions to the Title Policy, including, without limitation, deletion of the survey exception; (ii) one-half (1/2) of any escrow fees charged by the Title Company; and (iii) except as otherwise set forth in this Contract, all other third party inspections of any kind ordered by Buyer.

(c)   Other. All other bills or charges pertaining to the Property as of the date of Closing shall be paid by Seller at or prior to Closing.

12.   Possession. Subject only to the Lease and the rights of possession granted therein, possession of the Property shall be delivered to Buyer at Closing free and clear of any and all liens, restrictions, or other encumbrances not otherwise approved as Permitted Exceptions as provided above and free of the rights of any third parties to use or occupy the Property.

13.   Representations, Warranties and Covenants. Seller makes the following representations, warranties and covenants as of the Effective Date of this Contract and as of the date of Closing, and such representations, warranties, and covenants shall survive Closing.

(a)   Title. Seller is the fee simple owner of the Property and has good and indefeasible title to the Property, free and clear of all mortgages, liens, encumbrances, security interests, leases, tenancies, covenants, conditions, restrictions, rights-of-way, easements, judgments and other matters affecting title, except for the Permitted Exceptions.

(b)   Authority. This Contract has been duly authorized by requisite action and is enforceable against Seller in accordance with its terms; neither the execution and delivery of this Contract nor the consummation of the sale provided for herein will constitute a violation or breach by Seller of any provision of any agreement or other instrument to which Seller is a party or to which Seller may be subject although not a party, or will result in or constitute a violation or breach of any judgment, order, writ, junction or decree issued against or binding upon Seller or the Property.

(c)   Not Foreign Person. Seller is not a foreign person or entity as defined in Section

1445 of the Internal Revenue Code of 1986, as amended, and Buyer is not obligated to withhold any portion of the Purchase Price for the benefit of the Internal Revenue Service.

(d)    No Condemnation.   Except for the condemnation that is the subject of the Condemnation Litigation defined and described below, there is no pending condemnation or similar proceeding affecting the Property, or any portion thereof, nor does Seller have any knowledge that any such action is presently contemplated; nor are there any pending public improvements in, about or outside the Property that will in any manner affect access to the Property or result in additional assessments against the Property. The condemnation attorney shall be selected by Buyer. Buyer will use Barron and Adler located in Austin, Texas.

(e)    No Legal Actions.   Except for the Condemnation Litigation and Aimee Haynes v. Cowboys, Cause No. 2012 CI 105.20; 57th Judicial District, Bexar County, Texas (said Aimee Haynes v. Cowboys referred to herein as the "**Haynes Litigation**"), there are no legal actions, suits or other legal or administrative proceedings pending or, to the best of Seller's knowledge, threatened against the Property or Seller, and Seller is not aware of any facts which might result in any such action, suit or other proceeding.

(f)    No Insolvency.   Except for the pending Bankruptcy; Case No. 18-51-837-RMK; Western Division, San Antonio, Texas (the "**Pending Bankruptcy**"), no attachment, execution, assignment for the benefit of creditors, receivership, conservatorship or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relieve laws is contemplated or has been filed by or against Seller or the Property, nor is any such action pending by or against Seller or the Property.

(g)    No Leases.   There are no parties in possession of any portion of the Property as lessees, tenants at will or at sufferance, trespassers or otherwise, and no person or party other than Buyer has any right or option to lease, purchase, acquire, occupy, use or possess the Property, or any portion thereof or any interest therein.

(h)    Environmental.   To the best of Seller's knowledge, no hazardous materials are now or ever were located on the Property and neither Seller nor any other person has ever caused or permitted any hazardous materials to be used, generated, released, discharged, stored, disposed, placed, handled or transported on, under, in, above, to or from the Property or any part thereof.  To the best of Seller's knowledge, the Property has never been used at any previous time for the disposal, storage, treatment, processing or other handling of hazardous materials.

(i)    Compliance With Laws.   The Property is not in breach of any law, ordinance, or regulation, or any order of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, including, without limitation, those relating to environmental matters and hazardous waste, and no claim, action, suit or proceeding is pending or, to the best of Seller's knowledge and belief and after due inquiry, threatened against or affecting Seller or the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or entity wherever located, with respect to the Property or Seller's present use and operation of the Property.

(j)     No Commitments.   No commitments have been made by Seller to any governmental or quasi-governmental authority, utility company, utility district, school board, church or other religious body, homeowners or property owners association, or to any other individual, entity, organization or group relating to the Property which would impose an obligation upon Buyer, or its successors or assigns, to make any contribution or dedication of money or land, or to construct, install or maintain any improvements of a public or private nature on or off of the Property.

(k)     No Changes.  From and after the Effective Date hereof through Closing, Seller shall (i) refrain from performing any grading or excavation on, over and/or under the Property, (ii) refrain from committing any waste of the Property, (iii) observe all laws, ordinances, regulations and restrictions affecting the Property in all material respects, (iv) not remove, demolish, damage or modify any existing Improvements or construct, or contract to construct, any additional structures or other improvements on, over and/or under the Property, and (v) not encumber or consent to the further encumbrance of the Property, or any portion thereof.

(l)     No Contracts.  From and after the Effective Date hereof through Closing, Seller shall not, without Buyer's prior written consent, execute or enter into any development, landscape management, maintenance and/or service agreements, restrictive covenant agreements, leases, licenses, easements or other contracts or agreements of any kind or nature affecting the Property, or any portion thereof, that will be binding on the Property after Closing. Seller has not and will not enter into any written contracts, agreements, leases, or listings, or be a party to any oral understandings or agreements affecting the Property which may become binding upon Buyer.

(m)     Due Diligence Documents. The Documents delivered by Seller to Buyer pursuant to this Contract shall be true, correct, and complete copies of all of the corresponding materials in Seller's possession or control, and shall be accurate in all respects.

(n)     Agreement to Cooperate.  From and after the Effective Date hereof and prior to Closing, Seller agrees to cooperate fully with Buyer (at no cost to Seller) in connection with Buyer's pursuit of any permits or approvals from any applicable city, county, state or other governmental authorities related to Buyer's intended use of the Property. Seller agrees to keep in the strictest confidence all information relating to such applications or otherwise pertaining to Buyer's intended use of the Property.

The covenants, representations, and warranties of Seller set forth above and contained elsewhere in this Contract shall survive and be enforceable after Closing, shall not be merged into the documents executed at Closing, and shall not be affected by any investigation, verification, or approval by any party hereto or by anyone acting on behalf of any party hereto.  Seller hereby indemnifies and agrees to defend and hold Buyer harmless from and against any and all claims, causes of action, losses, costs, expenses (including reasonable attorneys' fees) and other damages incurred or suffered by Buyer and in any way arising out of or related to any breach by Seller of its covenants, representations, and warranties under this Contract, and the absence of any such breach at or prior to any Closing shall be a condition to Buyer's obligations under this Contract and any such breach shall be a default by Seller under this Contract.

14.    **Notices**.  Any notice or designation to be given hereunder shall be sent or delivered, as applicable, to the address of the party for whom it is intended at the address of such party as shown below, by any of the following means: (i) delivered in person; (ii) sent by United States mail, certified or registered, properly stamped and addressed; (iii) sent by overnight delivery service such as Federal Express or UPS.  Copies of such notices may be sent by facsimile or electronic mail.  Notices shall be delivered as follows:

| | |
|---|---|
| Seller: | Cowboys Far West, Ltd.<br>3030 N.E. Loop 410<br>San Antonio, Texas 78218<br>Attn:  Gena Scott |
| Buyer: | Heiser Development Corporation<br>901 S. Mopac Barton Oaks #2, Suite 505<br>Austin, Texas 78746<br>Attn:    Bradfield Heiser, Vice President<br>E-mail: bheiser@heiserdev.com |
| With a copy to: | Metcalfe Wolff Stuart & Williams LLP<br>221 W. 6th Street, Suite 1300<br>Austin, Texas 78701<br>Attn: Ari Kuchinsky<br>E-mail: akuchinsky@mwswtexas.com |

If such notice is hand delivered, mailed or sent by overnight delivery service, the effective date of such notice shall be the earlier of actual receipt and the date the notice is deposited with the courier, US Mail or overnight delivery service.  The address at which any party hereto is to receive notice may be changed from time to time by such party by giving notice of the new address to all other parties as provided above, otherwise notice sent to the address for each party shown above shall be sufficient notice hereunder.

15.    **Condemnation; Condemnation Litigation**.  Prior to Closing, all risk of loss with regard to the Property shall be borne by Seller.  If, prior to Closing, the Property is destroyed or damaged, or becomes subject to a taking by virtue of eminent domain, to any extent whatsoever, Buyer may, in Buyer's sole discretion, terminate this Contract, whereupon the Title Company shall return to Buyer immediately the total amount comprising the Earnest Money theretofore paid by Buyer under this Contract.  If Buyer does not elect to terminate this Contract hereunder and proceeds to close on the purchase of the Property, then Seller shall assign to Buyer all interest of Seller in and to any condemnation awards or insurance proceeds which may be payable to Seller on account of such occurrence; provided that, if any such awards or proceeds are actually paid prior to the Closing, Seller shall pay Buyer an amount equal to such awards and proceeds at Closing. Notwithstanding the foregoing to the contrary, the parties hereby acknowledge that, as of the Effective Date hereof, there is currently condemnation litigation affecting the Property (such litigation as it exists as of the Effective Date hereof, the

"**Condemnation Litigation**"). The parties hereby further expressly agree that, following Closing, Buyer shall take charge of the Condemnation Litigation and shall be the beneficiary of one hundred percent (100%) of the award or other proceeds arising from any condemnation of the Property pertaining thereto.

16.    **Default**.

    (a)    Buyer's Default.  In the event Buyer fails or refuses to perform in accordance with the terms of this Contract, through no fault of the Seller, then, and in that event, Seller shall give written notice of such default to Buyer and Title Company, and if Buyer's default is not cured within thirty (30) days after Seller's notice, then Seller shall have, as its sole and exclusive remedy, the right to terminate this Contract and receive the Earnest Money as liquidated damages.

    (b)    Seller's Default.  In the event Seller fails or refuses to perform in accordance with the terms of this Contract, through no fault of the Buyer, then and in that event, Buyer shall have the right to terminate this Contract and receive back the Earnest Money or enforce specific performance of this Contract.

    (c)    Prevailing Party.  In the event either party hereto defaults (or is alleged to have defaulted) in the performance of any of the terms, covenants, agreements or conditions contained in this Contract, and the other party hereto places the enforcement of this Contract, or any part hereof, in the hands of attorneys, or files suit upon the same, the non-prevailing party agrees to pay the reasonable attorneys' fees and all court courts of the prevailing party.

17.    **Real Estate Commission**.  Seller shall be solely responsible for the payment of, and shall pay at Closing, any and all commissions and similar fees owing to Carlos Klutts, as Seller's broker, and Bradfield Heiser, as Buyer's broker (collectively, the "**Brokers**") as a result of this sale, and Seller hereby indemnifies and holds Buyer harmless from any and all such real estate commissions, claims for such commissions, or similar fees from Brokers.  Except as set forth above in this paragraph, neither party to this Contract has utilized the services of any real estate broker, agent, or salesperson in connection with this transaction, and Seller and Buyer each hereby agree to indemnify and defend the other party from any claims for broker commissions or other compensation of any other real estate broker, agent, or salesperson claiming by, through, or under the indemnifying party.  The reciprocal obligations of indemnity set forth in the preceding sentence shall survive the Closing or any termination of this Contract.

18.    **Entire Agreement**.  This Contract constitutes the entire agreement of the parties hereto and may not be modified, amended or supplemented except by a written agreement signed by Seller and Buyer (which shall not t include any facsimile or electronic mail correspondence) and dated subsequent to the date hereof.  If any provision of this Contract shall be held invalid or unenforceable, the remainder of the Contract shall not be affected thereby.

19.    **Binding Effect**.  This Contract shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

20.    **Assignability**.  Buyer shall have the right to assign its interest as "Buyer" under this

Contract at any time without the consent of Seller. Following any such assignment, Seller agrees to close this transaction with the assignee of Buyer, and "Buyer" named hereunder shall be released from its obligations hereunder. Seller shall have the right to assign its interest under this Contract subject to the consent of Buyer, which approval will not be unreasonably withheld, provided that Seller conveys the Property to such assignee contemporaneously with such assignment and such assignee assumes all obligations of Seller hereunder.

21. **Governing Law**. This Contract shall be governed by and construed and interpreted under the laws of the State of Texas, and shall be binding on the parties hereto and their heirs, successors and assigns.

22. **Counterparts**. This Contract may be executed in multiple originals or in counterparts, each of which will be an original and all of which taken together shall constitute one Contract.

23. **Relationship**. This Contract does not create and shall not be construed to create a partnership, association, joint venture, or a fiduciary relationship of any kind or character between any parties to this Contract.

24. **Effective Date**. For purposes of this Contract it is agreed that the "**Effective Date**" of this Contract shall be the date on which a fully executed copy of this Contract, signed by both Seller and Buyer, is deposited with the Title Company. The receipt of this Contract issued by the Title Company shall be conclusive evidence of the Effective Date of this Contract. If the conclusion of any time period provided for herein falls on a weekend or a legal holiday, the conclusion of such time period shall be deemed to be extended until the next business day.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

-11-

IN WITNESS WHEREOF, each of the parties has executed this Contract to be effective as of the Effective Date hereof.

**SELLER**:

**COWBOYS FAR WEST, LTD.,**
a Texas limited partnership

By:    Cowboys Concert Hall-Arlington, Inc.,
its general partner

By: _____
Name: __MIKE MURPHY__
Title: _____

EXECUTED by Seller __3/5__, 2019.

**BUYER**:

**HEISER DEVELOPMENT CORPORATION,**
a Texas corporation

By: _____
Name: __Bradfield Heise__
Title: __Vice President__

EXECUTED by Buyer __3/5__, 2019.

**EXHIBITS**:
A – Legal Description of the Land

*Signature Page to Purchase and Sale Agreement (3030 NE Loop 410)*

## TITLE COMPANY RECEIPT ACKNOWLEDGMENT

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of this Contract, and agrees to perform the duties of Title Company, including disbursement of the Earnest Money, strictly in accordance with the terms of the Contract.

### TITLE COMPANY:

### FIRST AMERICAN TITLE COMPANY

By:_____

Name: _____

Title: _____

Date:_____

*Signature Page to Title Company Receipt Acknowledgment (3030 NE Loop 410)*